BWB:DMP
F.#2010R01924

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

12- 127M

UNITED STATES OF AMERICA

     - against -

RAAFAT HAIDER,
     also known as "Alex,"
GAMEL MOHAMMED, and
JIMMY LNU,

                Defendants.

AMENDED COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
ARREST WARRANTS

(T. 7, U.S.C.,
§ 2024(b)(1); T. 18,
U.S.C. § 371)

- - - - - - - - - - - - - - - - - -X
- - - - - - - - - - - - - - - - - -X
IN THE MATTER OF THE SEARCH OF THE
PREMISES KNOWN AND DESCRIBED AS KING
RALPH DELI CORP., 57 RALPH AVENUE,
BROOKLYN, NEW YORK 11221, INCLUDING
THE BASEMENT AREA.

AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT

- - - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

       LUIGI STOLFA, being duly sworn, deposes and says that

he is a Special Agent with the United States Department of

Agriculture, Office of Inspector General ("OIG").

       In or about and between April 2009 to the present, both

dates being approximate and inclusive, within the Eastern

District of New York and elsewhere, the defendants RAAFAT HAIDER,

also known as "Alex," GAMEL MOHAMMED, and JIMMY LNU together with

others, willfully and intentionally conspired to use, transfer,

acquire and possess food stamp benefits, in excess of $5,000,

-1-

contrary to the Supplemental Nutrition Assistance Program, and regulations issued thereunder, in violation of Title 7, United States Code, Section 2024(b)(1).[1]

Upon information and belief, there is probable cause to believe that there is evidence located inside THE PREMISES KNOWN AND DESCRIBED AS KING RALPH DELI CORP., 57 RALPH AVENUE, BROOKLYN, NEW YORK 11221, INCLUDING THE BASEMENT AREA (the "SUBJECT PREMISES"), and any closed containers and items contained therein, of violations of Title 7, United States Code, Section 2024 and Title 18, United States Code, Section 371 (unauthorized use, transfer, acquisition and possession of USDA food stamp benefits and conspiracy to commit same (collectively, "the Offenses")).

The sources of my information and the grounds for my belief are as follows:

1. I am a Special Agent with the United States Department of Agriculture ("USDA") and have been so employed for two year and four months. Prior to working for the USDA, I spent eight years in the United States Navy as an intelligence specialist and one year as an investigative assistant with the Office of Personnel Management. During my time as a Special Agent with USDA, I have been involved in many investigations relating to violations of federal law, including violations of

---

[1] A copy of 7 U.S.C. § 2024 is attached.

Title 7, United States Code, Section 2024 and Title 18, United States Code, Section 371.  I have received training in various investigative techniques including the execution of search warrants.

　　　　2.  The statements contained in this Affidavit are based upon my investigation, my experience, and my background as a special agent with USDA, information provided by other law enforcement agents and reports that I have reviewed.  I have set forth in this affidavit only the facts necessary to establish probable cause to arrest and to search.

　　　　3.  The SUBJECT PREMISES occupies the ground floor and basement of a three-story, red brick building at the northwest corner of Ralph Avenue and Monroe Street in Brooklyn.  The ground floor is a retail grocery store known as "King Ralph Deli Grocery," "Paradise Deli" and "Dubai Deli and Grocery."  The retail grocery store is accessed by entering the front of the store through a glass front door in the middle of the building on Ralph Avenue.  Over the exterior of the grocery store is a red awning with pictures of deli sanwiches.  Above the awning is a sign with white letters reading "Dubai" and red letters reading "DELI & GROCERY" on a silver background.  Inside the store, the cashier area is on the left and the freezer area is on the right. Two grocery aisles are beyond the cashier area, and a door leading to additional space is beyond the grocery aisles.  The

-3-

basement area is accessed through a set of storm cellar doors on the Monroe Street side of the building.  Surveillance revealed store employees making numerous trips outside of the store to the basement via the storm cellar doors.

## Background

4.   The USDA administers a food stamp program in which pre-approved food retailers may sell food in exchange for coupons, commonly known as food stamps, presented by eligible members of certain low-income households.  These USDA food stamps may only be used to purchase certain eligible food items, and, pursuant to 7 U.S.C. § 2016 and 7 C.F.R. § 278.2(a), an authorized retail food store may not exchange cash for USDA food stamps.  In addition, food stamps may not be used to purchase coffee or cigarettes.  Congress' enactment of the 2008 Farm Bill, Pub. L. No. 110-246, brought several changes to what used to be known as the Food Stamp Program.  The following summary of the changes is for reference.  The "Food Stamp Act of 1977" was renamed the "Food and Nutrition Act of 2008."  The food stamp program was renamed the Supplemental Nutrition Assistance Program ("the SNAP").  Section 15 of the Food and Nutrition Act of 2008 (7 U.S.C. § 2024) was amended so that all references to coupons, authorization cards, and/or access devices were replaced with the broader term "benefits."

-4-

5. Retailers who participate in the SNAP must apply for a license to redeem food stamps. A retailer's application must detail, among other things, the retailer's address, owners, hours of business, estimated gross annual food sales, and other pertinent information. Before the SNAP will authorize a retailer to participate in the program, an owner or designated representative of the retailer is required to be notified of rules and regulations and at times attend an orientation class at which pertinent rules and regulations pertaining to the food stamp program are taught.

6. SNAP benefits are distributed to recipients in the New York metropolitan area through the use of Electronic Benefit Transfer ("EBT") cards provided by the SNAP, which function in a manner similar to debit cards. On the back of each EBT card, there is a magnetic strip containing electronically coded information identifying the particular recipient and the dollar amount of the benefits to which that recipient is presently entitled. At the beginning of each month, the benefits are encoded electronically on this magnetic strip. For instance, if a recipient is authorized to receive $300 per month in SNAP benefits, the recipient's SNAP EBT card would reflect those benefits beginning on or about the first day of each month.

7. Retailers who have been approved by the SNAP to participate in the program receive a computer terminal capable of

-5-

reading the coded information on the SNAP EBT card and adjusting the available dollar amount when a user makes eligible purchases with the card.  This electronic transfer of benefits is initiated at the retailer's terminal by deducting benefits from the recipient's account and crediting the amount to a bank account that the retailer earlier authorized for that purpose.  Both the State of New York and the SNAP in Washington, D.C. maintain computerized records of each EBT card transaction, including the time and amount of each transaction.  Portions of the transmission of data between retailers' SNAP EBT computer terminals in the New York City metropolitan area, computers maintained by the State of New York, and computers maintained by SNAP in Washington, D.C. occur over interstate wires.

8.  For each SNAP EBT card transaction, the retailer's computer terminal prints a receipt stating: "DO NOT DISPENSE CASH."  In addition, the training literature provided by the SNAP instructs the retailers that no cash may be dispensed during a SNAP EBT transaction.  The orientation class that an owner or designated representative is required to attend also teaches that no cash may be dispensed during a SNAP EBT transaction.  In addition, the SUBJECT PREMISES contains a sign above the cashier area in the retail grocery store that reads: "We Don't Cash Food Stamp.  Food Stamp Only For Food."

-6-

9.  SNAP records show that the SUBJECT PREMISES was authorized to participate in the SNAP in or about April 2009. The store was registered as a small grocery store with two aisles of groceries and one register.  The store's annual gross retail and wholesale sales were estimated to be $185,754.  In 2011, King Ralph Deli Corp. had redemptions of approximately $130,750 for SNAP EBT transactions over $50.

10.  Pursuant to the SNAP rules, RAAFAT HAIDER, also known as "Alex," as President of the King Ralph Deli Corp., provided a bank account at Bank of America that would be used for any redemption of SNAP benefits at the SUBJECT PREMISES.  Thus, from in or about April 2009, up to and including the present, the SNAP has transmitted all funds owed as credit for food stamp redemptions at the King Ralph Deli Corp. to the account at Bank of America, for which HAIDER is the designated account-holder, via direct deposit from bank accounts in Washington, D.C.

**Investigation of the Defendants**

11.  Between approximately November 2009 and the present, defendants RAAFAT HAIDER, also known as "Alex," and JIMMY LNU have operated the cash register and acted as cashiers at the retail grocery store located at the SUBJECT PREMISES. Between 2011 and the present, defendant GAMEL MOHAMMED has also operated the cash register and acted as a cashier at the retail grocery store located at the SUBJECT PREMISES.

-7-

12. For approximately two years, USDA OIG agents have
been investigating the defendants for possible violations of the
SNAP EBT benefits program. This investigation has revealed that
the defendants, individually and collectively, debit customers'
SNAP EBT cards for an amount that supposedly represents the price
of a purchase of food. In these exchanges for SNAP EBT benefits,
defendants RAAFAT HAIDER, also known as "Alex," JIMMY LNU and
GAMEL MOHAMMED give cash to the customer in an amount that was
approximately 33 percent less than the total value of the SNAP
EBT benefits charged against the customer's EBT account. In
turn, the defendants took the difference in value not given to
the customer and improperly transfered these SNAP EBT funds to
the King Ralph Deli Corp. account in violation of the law.

13. From about November 2009 through January 2012, a
cooperating witness ("CW-1") working under the direction of USDA
OIG agents, engaged in SNAP EBT "purchases" from the SUBJECT
PREMISES in which employees of King Ralph Deli Corp. redeemed
SNAP EBT benefits from CW-1 in exchange for cash at a discounted
rate. CW-1 is an individual who has provided reliable
information to the government in the past and the information CW-
1 has provided in the past has been corroborated. CW-1
consensually and surreptitiously recorded the conversations
during which these transactions occurred. With respect to the
transactions listed in paragraphs 14 through 20, CW-1 recorded

-8-

these transactions by either audio or video surveillance equipment.

14. During an undercover operation conducted on February 2, 2010, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with defendant JIMMY LNU. CW-1 gave JIMMY LNU food items totaling $5.00 and the EBT card and asked for $50 cash back. JIMMY LNU agreed to give the cash. He processed the EBT card for $100.08 and handed CW-1 $65 cash. Thus, CW-1 received $65 cash in exchange for $95.08 in EBT benefits.

15. During an undercover operation conducted on March 2, 2010, CW-1 again used a SNAP EBT card at the SUBJECT PREMISES with defendant JIMMY LNU. CW-1 gave JIMMY LNU food items totaling $7.25 and the EBT card and asked for $30 in cash. JIMMY LNU agreed, and gave CW-1 the cash in exchange for a $68.25 charge to the SNAP EBT account. Thus, CW-1 received $30 cash in exchange for a $61.00 in EBT benefits.

16. During an undercover operation conducted on March 10, 2010, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with the defendant JIMMY LNU. CW-1 gave JIMMY LNU food items totaling $3.00 and the EBT card and asked for $50 in cash. JIMMY LNU agreed, and gave CW-1 $60 in exchange for $104 charge to the SNAP EBT account. Thus, CW-1 received $60 cash in exchange for $101 in EBT benefits.

17. During an undercover operation conducted on February 10, 2011, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with

-9-

RAFAAT HAIDER, also known as "Alex." CW-1 gave HAIDER the EBT card and asked for $100 cash. HAIDER said he had just given $100 in cash right before CW-1 entered the store and could not do two such transactions back-to-back. HAIDER said he could only give CW-1 $30 in cash. CW-1 agreed to the transaction and received $30 in cash in exchange for a $69.75 charge to the SNAP EBT account.

18. During an undercover operation conducted on April 13, 2011, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with the defendants GAMEL MOHAMMED and JIMMY LNU. CW-1 gave MOHAMMED a hot sandwich priced at $2.50 and laundry detergent priced at $10.00, and asked for $50 in cash. JIMMY LNU indicated to MOHAMMED that it was okay to give cash to CW-1. MOHAMMED then gave CW-1 $50 in cash, the sandwich and the detergent in exchange for $102.25 charge to the SNAP EBT account. Thus, CW-1 received $50 cash in exchange for a $89.75 in EBT benefits.

19. During an undercover operation conducted on May 12, 2011, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with JIMMY LNU. CW-1 gave JIMMY LNU laundry detergent priced at $10.99 and the EBT card, and asked for $60 in cash. JIMMY LNU agreed, and gave CW-1 $60 in exchange for $113.75 charge to the SNAP EBT account. Thus, CW-1 received $60 cash in exchange for a $102.76 in EBT benefits.

20. During an undercover operation conducted on June 10, 2011, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with RAAFAT HAIDER, also known as "Alex." CW-1 asked HAIDER for a pack of

-10-

cigarettes, coffee and $60 cash.  HAIDER swiped the SNAP EBT card and charged it $123.40 and gave CW-1 $60, the cigarettes and the coffee.

21.   From about June 2011 through January 2012, another cooperating witness ("CW-2") working under the direction of USDA OIG agents, engaged in SNAP EBT "purchases" from the SUBJECT PREMISES in which employees of King Ralph Deli Corp. redeemed SNAP EBT benefits from CW-2 in exchange for cash at a discounted rate.  CW-2 consensually and surreptitiously recorded the conversations during which these transactions occurred.  With respect to the transactions listed in paragraphs 21 through 22, CW-2 recorded the transaction by both audio and video surveillance equipment.

22.   During an undercover operation conducted on November 2, 2011, CW-2 used a SNAP EBT card at the SUBJECT PREMISES with the defendant GAMEL MOHAMMED.  CW-2 gave MOHAMMED a pack of cigarettes and a butter roll and asked for cash. MOHAMMED said to come back in a half in hour and he would give cash.  CW-2 purchased the cigarettes and butter roll for $12.00 in EBT benefits.  Approximately a half an hour later, CW-2 returned to the SUBJECT PREMISES and asked MOHAMMED for cash. MOHAMMED swiped the SNAP EBT card and charged it $85.29 and gave CW-2 $50 in cash.

-11-

23. During an undercover operation conducted on December 22, 2011, CW-2 used a SNAP EBT card at the SUBJECT PREMISES with the defendant GAMEL MOHAMMED. CW-2 gave MOHAMMED macaroni and cheese, corned beef and beefaroni, and asked for cash. MOHAMMED said, in part and in sum and substance, that they did not have much cash but that he could give $7.50 cash with the purchase. MOHAMMED swiped the SNAP EBT card and charged it $25.00 and gave CW-2 the groceries and $7.50 in cash.[2]

## Comparison to Similar Markets

24. The SUBJECT PREMISES is classified by USDA as a small grocery store. USDA classifies stores according to size based upon a store's estimated or actual sales figures. Your Affiant's visual observations of the SUBJECT PREMISES during the relevant period revealed that it had limited eligible food stock

---

[2]    In paragraph 21 of the original Complaint, an employee who worked at the SUBJECT PREMISES, and who charged CW-2's SNAP EBT card in the amount of $112.41 and gave CW-2 $50 cash, as well as soda, two cans of corned beef, and two packs of cigarettes on January 23, 2012, was incorrectly identified as defendant GAMEL MOHAMMED. On February 1, 2012, I showed CW-2 surveillance photos of two individuals, later identified as GAMEL MOHAMMED and Amer Nagi Yahia. CW-2 said that CW-2 had received cash in exchange for SNAP EBT benefits from both individuals. CW-2 incorrectly identified the photograph of MOHAMMED as the person CW-2 had obtained cash from the most recent time CW-2 had done an undercover transaction. Upon a review of the video of the January 23, 2012 transaction, I determined that the individual who had given CW-2 cash for SNAP EBT benefits was Yahia, not MOHAMMED.

displayed along the aisles, and the store operated only one cash register.

25.   USDA redemption data was used to compare the amount of SNAP benefits redeemed at the SUBJECT PREMISES during the time period October 2010 through October 2011 with other similar-sized grocery stores in the same geographical area.   This comparison showed that during the period in question, the other similar-sized grocery stores redeemed between $1,385 and $3,532 in SNAP benefits each month for transactions over $50, while the SUBJECT PREMISES redeemed an average of $12,322 (with a high of nearly $20,000) in SNAP benefits each month for transactions over $50.

**Surveillance**

26.   Surveillance conducted at the SUBJECT PREMISES during undercover operations revealed that the dollar amount of SNAP EBT purchases associated with the bank account for the SUBJECT PREMISES could not be substantiated by the customer base observed.   Many customers left the store empty-handed or with only a beverage or a small bag.   No shopping baskets or shopping carts were offered to customers.

**Conclusion**

27.   Based on the foregoing, as well as my conversations with other law enforcement officers, training, and experience regarding the practices and methods of supplemental

-13-

nutrition assistance program fraud, I respectfully submit that there is probable cause to believe that the SUBJECT PREMISES contain instrumentalities, evidence, and fruits of criminal activity.  These instrumentalities, evidence, and fruits include:

          a.    Electronic benefit transaction ("EBT") cards;

          b.    Equipment used in connection with EBT card transactions, including but not limited to EBT terminals, pin pads, card swipe devices, and recipient printers;

          c.    Any and all materials/equipment relating to the USDA's supplemental nutrition assistance program, including but not limited to licenses, application materials, notices, training materials, records of redemptions, service records;

          d.    Any and all licenses (and related application materials) permitting the sale of items at the SUBJECT PREMISES, including but not limited to cigarettes, alcohol, New York Lotto, and other items.

          e.    Financial/business records, including but not limited to checks, wires, journals, ledgers, calendars, employee schedules, faxes and/or fax machines, stored records inside cash registers, diaries, account applications, service agreements, contracts, loans, credit cards, bills, receipts, deposit and withdrawal slips, bank statements, correspondence relating thereto (including electronic mail);

          f.    Invoices, payroll records, and tax
records/returns;

          g.    Address books, contact lists, phone directories,
calendars, and/or any personal data assistants or other
electronic devices (including computers) containing such
information;

          h.    United States currency; and

          i.    Any audio and/or video recordings of activities at
or near the SUBJECT PREMISES.

          28.   In addition, I respectfully request permission to,
if necessary, remove any closed containers (including computer
equipment or data storage devices) from the SUBJECT PREMISES, if
such containers cannot be opened or accessed by law enforcement
personnel conducting the initial search.   Law enforcement
officers will determine during the search whether the removal of
some or all container/equipment is necessary to retrieve relevant
materials.   If it appears necessary to remove the
container/equipment to permit the search for relevant materials,
the container/equipment will be removed from the SUBJECT PREMISES
until its contents can be accessed by other law enforcement
officials.   If the container/equipment itself is not relevant
evidence or subject to forfeiture, relevant materials will be
retrieved and the container/equipment will be returned to the
SUBJECT PREMISES as quickly as possible.

                              -15-

WHEREFORE, your deponent respectfully requests that a warrant be issued under seal authorizing a search of SUBJECT PREMISES, including any locked rooms, containers or safes located therein, and authorizing seizure of the items described in Schedule A hereto, all of which constitute evidence, fruits, and instrumentalities of violations of Title 7, United States Code, Section 2024(b)(1) and Title 18, United States Code Section 371.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants RAAFAT HAIDER, also known as "Alex," GAMEL MOHAMMED and JIMMY LNU and that the defendants be dealt with according to law.

Luigi Stolfa
Special Agent
U. S. Department of Agriculture
Office of Inspector General

Sworn to before me this
22nd day of February, 2012

3E

-16-